**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **TRICIA GALBREATH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 15-308-CG-N** |
| | ) | |
| **HALE COUNTY, ALABAMA** | ) | |
| **COMMISSION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ON RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND, ALTERNATIVELY, MOTION FOR NEW TRIAL

This matter is before the Court on a renewed motion for judgment as a

matter of law and, alternatively, motion for new trial filed by Defendants Hale

County, Alabama, Commission and Hale, County, Alabama ("Defendants") (Doc.

80), a response in opposition filed by Plaintiff Tricia Galbreath ("Galbreath") (Doc.

96), and a reply thereto filed by Defendants (Doc. 105).[1]  For the reasons explained

below, the Court finds that Defendants' motion is to be denied.

## I. BACKGROUND

This case arises out of Galbreath's termination from the Hale County

Commission as its County Administrator.  When Galbreath began her employment

---

[1] Under the local rules, "[p]rincipal briefs in support of, or in opposition to, any motion must not exceed thirty (30) pages, and reply briefs must not exceed fifteen (15) pages." CIV. L.R. 7(e).  "No brief exceeding these page limitations may be filed unless the Court has previously granted leave to file a brief in excess of these limits. Both Defendants' Motion (Doc. 80) and Galbreath's Response (Doc. 96) significantly exceed the thirty-page limit; however, neither party sought leave of the Court before exceeding the limit.  The Court advises the parties to abide by this rule or risk some or all of future filings being disregarded.

with the Hale County Commission, she was provided and signed for a copy of the Hale County Personnel Policy (the "Policy"). Additionally, Galbreath and Defendants executed several employment contracts throughout her term of employment. During a county commission meeting on June 18, 2013, the Hale County Commission voted to terminate Galbreath's employment.

Based on her termination, Galbreath filed a multi-count complaint against Defendants. After the Court dismissed several claims in its Summary Judgment Order, Galbreath proceeded to trial with three claims remaining: (1) a Fourteenth Amendment procedural due process claim; (2) a state-law breach of contract claim; and (3) a state-law wrongful termination claim. Galbreath's claims were tried before a jury on March 23, 2017, through March 27, 2017. The jury returned a verdict in Galbreath's favor on all three claims. *See* (Doc. 73-1). The jury awarded Galbreath $8,000.00 in damages for any emotional pain and mental anguish she suffered from the date of her discharge to the date of the jury's verdict. *Id.* at 5. The jury also awarded Galbreath $128,600.00 in damages for lost wages and lost benefits from the date of Galbreath's discharge to the date of the jury's verdict. *Id.* Defendants now contend they are due judgment as a matter of law on all three claims. Alternatively, Defendants argue for a new trial on their affirmative defense of mitigation of damages, Galbreath's breach of contract claim, and the Court's charge to the jury regarding Galbreath's procedural due process claim.

## II. JUDGMENT AS A MATTER OF LAW

### A. The Renewed Motion for Judgment as a Matter of Law Standard

Judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure is appropriate where "there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1251 (11th Cir. 2007). In other words, a motion for judgment as a matter of law must be denied when there is enough evidence that reasonable minds could differ concerning material facts. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 993 (11th Cir. 1993). If the court denies a Rule 50(a) motion, the movant may file a "renewed motion" after trial. FED. R. CIV. P. 50(b).

The standard for deciding a Rule 50(b) motion is the same as a Rule 50(a) motion. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016). Thus, the proper Rule 50(b) "analysis is squarely and narrowly focused on the sufficiency of the evidence." *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007). In evaluating whether sufficient evidence supports a jury's verdict, "'the court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party.'" *Id.* (quoting *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1560 (11th Cir. 1995)). "But, an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." *Carlson v. United* States, 754 F.3d 1223, 1290 (11th Cir. 2014). And as the Eleventh Circuit instructed, "'It is the jury's task—not [the court's]—to weigh conflicting evidence and inferences, and determine the credibility of witnesses.'"

*Chaney*, 483 F.3d at 1227 (quoting *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002)).  Thus, judgment as a matter of law is "cautiously and sparingly" granted.  *Will v. Richardson-Merrell, Inc.*, 647 F. Supp. 544, 549 (S.D. Ga. 1986).

"A motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008).

## B. Whether Galbreath Received Pre-termination Due Process

Defendants contend, citing *Kelly v. Smith*, 764 F.2d 1412 (11th Cir. 1985), *overruled on other grounds*, *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994), that no constitutional minimum amount of time exists "that an employee must be afforded before being notified of charges, nor is there any constitutionally required minimum amount of time that an employee must be given between being notified of the charges and being given an opportunity to respond" in order to satisfy due process. (Doc. 80, p. 8).  In doing so, Defendants question the Court's citation to *Staples v. City of Milwaukee*, 142 F.3d 383 (7th Cir. 1998), in its summary judgment order. (Doc. 80, p. 14).

Further, Defendants maintain, *Ogburia v. Cleveland*, 380 F. App'x 927 (11th Cir. 2010), stands for the proposition that an employee need not be apprised that the charges against her may result in immediate termination. *Id.* at 9.  Defendants continue, "undisputed evidence" establishes that Galbreath was properly notified during the June 18, 2013 Hale County Commission executive session of the charges

against her, regardless of their truth. *Id.* at 7, 9. Defendants insist they gave

Galbreath an opportunity to respond but she chose to remain silent. *Id.* These

actions, Defendants argue, establish that "the procedural requirements of pre-

termination due process were satisfied." *Id.* at 10.

"[O]nce it is determined that the Due Process Clause applies, 'the question

remains what process is due.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532,

541 (1985) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). In *Mathews v.

Eldridge*, 424 U.S. 319 (1976), the Supreme Court set out three considerations a

court must evaluate in determining the scope of procedural protections required by

the Constitution:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through
> the procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that additional or substitute procedural
> requirements would entail.

*Id.* at 335. After balancing these factors, the *Loudermill* Court concluded due

process provides a public employee possessing a property interest in her

employment the following prior to termination:

> The essential requirements of due process … are notice and an
> opportunity to respond. The opportunity to present reasons, either in
> person or in writing, why the proposed action should not be taken is a
> fundamental due process requirement…. The tenured public employee
> is entitled to oral or written notice of the charges against him, an
> explanation of the employer's evidence, and an opportunity to present
> his side of the story.

*Loudermill*, 470 U.S. at 546 (citation omitted). More simply, "[t]he importance of [a]

[public employee's] property interest makes it necessary to provide some sort of pretermination hearing, which includes notice and an opportunity to be heard." *Harrison v. Willie*, 132 F.3d 679, 684 (11th Cir. 1998). And although Galbreath was not due a full evidentiary hearing or even a mini-trial, she was due a pretermination proceeding that served as "an initial check against mistaken decisions—essentially, a determination of whether there [we]re reasonable grounds to believe that the charges against [her were] true and support[ed] the purposed action." *See Loudermill*, 470 U.S. at 545–46.

As to Defendants' first contention, that the Eleventh Circuit has held "on-the-spot" terminations appropriate under *Kelly*, the Court concludes that *Kelly* does not sweep as broadly as Defendants contend. In *Kelly*, a county worker (Kelly) and his supervisor (Smith) disputed whether Kelly was scheduled to work standby. Kelly was adamant that he was not scheduled to work standby and refused to do so. Smith, however, was the individual tasked with "making the standby roster" and knew with certainty Kelly was on the schedule. When Kelly continued in his refusal to work standby, Smith responded that Kelly was to work standby or be terminated. Kelly continued in his refusal and walked off the job site. Smith terminated Kelly. Due to Kelly's flagrant disobedience, Smith was able to determine "whether there [were] reasonable grounds to believe that the charges against [Kelly, refusing to work standby when scheduled to do so,] were true and supported the proposed action." 764 F.2d at 1414. "Under such circumstances, there were adequate pretermination procedures to serve as 'an initial check against

mistaken decisions.'" *Id.* at 1415. In other words, because Smith was the source of the information and deciding individual, the risk of a mistaken decision was minimal.

The *Kelly* Court's reasoning evidences that the Eleventh Circuit did not announce a "one-size-fits-all" rule that "on-the-spot" terminations unequivocally satisfy due process as Defendants now contend. Moreover, as opposed to this case, the *Kelly* Court did not have before it a question of whether earlier notice or more complete notice was necessary, and the undersigned is unable to identify an Eleventh Circuit case addressing such questions. But, when the Seventh Circuit was tasked with addressing such questions in a due process claim, it reasoned, in relevant part:

> In light of the flexibility inherent in the Supreme Court's approach to pretermination hearings under *Loudermill*, we would not want to say that contemporaneous notice at a hearing could never satisfy due process. Whether it does or not will depend on what has taken place before the hearing, on the nature of the violation the employee is charged with, and on the risk of error if the employee does not have some advance notice of the hearing. In our case, not only was Staples unaware that the September 5 hearing was going to be about the fistfight incident, he affirmatively had been told that it was for an entirely different purpose. He had no idea that his job was on the line until Bock informed him that the police were at the door (a rather dramatic gesture, it seems). *Loudermill* makes it clear that the summary procedures that are required prior to termination are for the purpose of guarding against an erroneous deprivation. We cannot say, on the present record, that the procedures Bock followed met that standard. It is worth recalling that "procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exception." *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976). This means that, just as we reject demands for more process in exceptional cases, we also reject the argument that less process is due for idiosyncratic reasons.

*Staples*, 142 F.3d at 387; *see also Burton v. Ala. Dep't of Agric. & Indus.*, 587 F. Supp. 2d 1220, 1229 (M.D. Ala. 2008) (finding no due process violation as to notice of pre-disciplinary hearing, even though employee received notice late in the afternoon on the *day prior to the hearing*, where "[n]othing indicates that the short notice prevented Burton from participating in his hearing to the extent called for by the nature of the proceeding").

Considering *Kelly* and *Staples*, it becomes apparent that Defendants "one-size-fits-all" "on-the-spot" termination argument is unavailing. Both *Kelly* and *Staples* make clear that, although a full-fledged trial is not required, the notice due is tailored to the situation in order to ensure reasonable grounds exist to believe the charges are true, prevent a mistaken decision, and allow an employee to participate in the pre-termination proceeding. *Loudermill*, 470 U.S. at 546.

Applying these principles to the present case, a reasonable juror could conclude notice was constitutionally insufficient. The commissioners were the ultimate authority deciding Galbreath's termination but not the source of Galbreath's disciplinary form. Judge Crawford was the author and source of information in the disciplinary form. It was the intersection of the source and authority in *Kelly* that provided reasonable grounds to believe the charges were true and supported Kelly's "on-the-spot" termination, which satisfied due process.

Further, Galbreath testified she did not know Judge Crawford had issues with her work performance before the June 18, 2013 commission meeting. To the extent contrary testimony exists, the Court will not judge credibility. She testified

the closest thing to knowing there was any issue with her work was a letter from Commissioner Hamilton addressing Galbreath's use of language in a particular incident. But this letter was sent almost two years prior to Galbreath's termination. *See* (Doc. 72-2, p. 14). A reasonable juror could find that what took place prior to the June 18, 2013 commission meeting did not provide Galbreath with notice.

And Galbreath was not asked to attend the commission meeting to be reprimanded. Her job required her to be there to keep meeting minutes and assist the commission. No one except Judge Crawford testified at trial to knowing that the disciplinary form would be produced at the meeting. But even when it was produced, Galbreath did not know her job was on the line. Instead, it was understood Galbreath would be allowed to take corrective steps. *See* (Doc. 79, p. 142) (Commissioner Rhodes signed the disciplinary form in the executive session after being assured that Galbreath would be allowed to take corrective steps). That it was understood Galbreath did not face termination in the executive session further differentiates this case from *Kelly* where the employee knew from the start he faced termination. No mention of termination was made until Commissioner Anderson made the termination motion in the general session.

Even more, a review of the disciplinary form shows it provides only conclusory reasons for the disciplinary action (*e.g.*, "absence without authorized leave," "failure to carry out the duties of the job," "failure to meet the standards of appropriate attire on the job/workplace," etc.). (Doc. 72-1, p. 30). Neither the

factual bases nor the source of the information were provided. (Doc. 79-1, p. 46) (Commissioner Anderson explaining that Judge Crawford simply read the disciplinary form); (Doc. 79-1, p. 49) (Commissioner Hamilton explaining that Judge Crawford simply read the disciplinary form); (Doc. 79, p. 106) (Judge Crawford explaining that he read the disciplinary form). This is troublesome given that the nature of the violations against Galbreath were extensive and, based on the disciplinary form, seemed to cover a span of time, not just an isolated instance as was the case in *Kelly*.

A voluminous explanation of the charges was unnecessary. *See Harrison*, 132 F.3d at 681 ("Defendant Gree also explained the charges against Plaintiff and summarized for Plaintiff the information gained so far by the internal investigation.") Nonetheless, an explanation of the evidence amassed was due. *Loudermill*, 470 U.S. at 546; *see also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *Ogburia*, 380 F. App'x at 929 (employee was provided details of the charges and "copies of the formal complaints" against him); *McDaniels v. Flick*, 59 F.3d 446, 457 (3rd Cir. 1995) (explaining that notice need not be "in great detail as long as it allows the employee the opportunity to determine what facts, if any, within his knowledge might be presented in mitigation of or in denial of the charges"); *Clemons v.*

*Dougherty Cnty.*, 684 F.2d 1365, 1374 (11th Cir. 1982) ("Due process required, at least, that Clemons be advised of the charges against him in sufficient detail fairly to enable him to show any error that might exist....")  Without an explanation and some prior notice, a reasonable juror could have concluded that Galbreath could not participate in her pre-termination hearing to the extent called for by the nature of the proceeding.

An explanation would have provided the commissioners a reasonable basis to know whether the charges in the disciplinary form were true and could support termination.  But the testimony of two commissioners shows that such was not the case.  Commissioner Rhodes testified that he abstained from voting on Galbreath's termination because he would have liked to hear Galbreath's side of the story.  (Doc. 79, p. 77).  Commissioner Rogers testified that, even at trial, he did not know why Galbreath was terminated.  (Doc. 72-1, p. 56).  Thus, based on the facts of this case, a reasonable juror could conclude that the contemporaneous and conclusory disciplinary form did not pass constitutional muster.

Further, the Court finds unavailing Defendants' contention that under *Ogburia* Defendants need not apprise Galbreath that she faced termination. Indeed, as Galbreath points out, "There is no explicit holding contained in *Ogburia* supporting [ ] Defendants' assertion."  (Doc. 96, p. 35).  Instead, a review of *Ogburia* shows that Galbreath was due notice that she faced termination, not just a written reprimand.  Before finding no pre-termination due process violation, the *Ogburia* Court quoted *Loudermill* and explained, "'The opportunity to present reasons, either

in person or in writing, *why the proposed action* should not be taken is a fundamental due process requirement....'"  308 F. App'x at 929 (quoting *Loudermill*, 470 U.S. at 546).  This language identifies that the proposed action must be noticed in the pre-termination proceeding.

Here, the disciplinary form states that it was a written reprimand.  (Doc. 72-1, p. 30).  The box for "termination" is blank.  Even more, Commissioner Rogers clarified that termination was not sought before signing the form.  (Doc. 79, p. 142).  Judge Crawford testified that it was his intentions to allow Galbreath an opportunity to take corrective steps, not to terminate her with the form.  (Doc. 79, p. 98).  The disciplinary form warns that termination *could be the next step* if the corrective steps were not followed.  (Doc. 72-1, p. 30). Surely the consequences related to an erroneous decision regarding a written reprimand are lesser than those of a termination.  A reasonable juror could find that Galbreath was not properly apprised of the severity of the action to be taken against her.

Defendants also contend judgment as a matter of law is due because Galbreath was afforded an opportunity to respond but answered "no comment." (Doc. 80, p. 10).  Galbreath counters that the evidence showed Defendants failed to provide her with a meaningful opportunity to respond.  (Doc. 96, p. 30).  Instead, Galbreath contends she was told to "shut up" when she attempted to respond.  *Id.*

All due process requires an employee be afforded is the opportunity to "respond after being confronted with the charges."  *Harrison*, 132 F.3d at 684. Notwithstanding the summary nature of such an opportunity, an employee should

be allowed to "present evidence in [her] defense—to tell [her] side of the story," *Harrison*, 132 F.3d at 684, and the opportunity to respond must be meaningful, *LaChance v. Erickson*, 522 U.S. 262, 266 (1988) (citing *Loudermill*, 470 U.S. at 542).

Galbreath testified that she attempted to respond and defend herself while Judge Crawford read the disciplinary form, but the testimony of two witnesses established that Judge Crawford told Galbreath to sit still and shut up. (Doc. 79, p. 142) (Galbreath); (Doc. 79, p. 76) (Commissioner Rhodes). When asked on cross-examination whether she was offered a chance to respond after Judge Crawford read the form, Galbreath stated she did not remember Judge Crawford giving her the opportunity. (Doc. 79, p. 215). The only statement she mentioned Judge Crawford making was asking her to sign the disciplinary form. *Id.* When asked on direct examination whether anything else occurred in the executive session after Judge Crawford talked to her about the disciplinary form, Galbreath unequivocally answered, "No, sir." *Id.* at 152. Commissioner Anderson also testified that the only thing Judge Crawford asked of Galbreath after reading the disciplinary form was for her signature. (Doc. 79-1, p. 46). A reasonable juror could infer from this that Galbreath was not provided an opportunity to respond on June 18, 2013.

Judge Crawford and other commissioners did contradict this in their testimony and stated that Galbreath was afforded an opportunity to respond but simply replied "no comment." If true this could lead a reasonable juror to conclude that Galbreath was provided an opportunity to respond. But the Court will not determine which account is more credible. This was a job for the jury, and the

Court will draw all reasonable inferences in Galbreath's favor. *See Adler*, 137 F.3d at 1340 (concluding that a court may not "decide the credibility of witnesses" in reviewing a motion for judgment as a matter of law).

Moreover, reasonable jurors could have concluded that, if an opportunity to respond was provided, it was not meaningful. The disciplinary form was a surprise for Galbreath and the other commissioners. *See, e.g.*, (Doc. 79-1, pp. 45, 59). As explained above, the notice was conclusory, without factual explanation, and without any supporting materials. It is hard to understand how Galbreath could meaningfully respond without knowing the factual bases of the allegations or having prior knowledge of a wrongdoing. Thus, a reasonable juror could conclude that a serious risk of an erroneous decision existed and Galbreath was not afforded a meaningful opportunity to respond to the charges against her that formed the bases of her termination. Defendants are not due judgment as a matter of law on Galbreath's pre-termination due process claim.

In like fashion, Defendants are not due judgment as a matter of law on their contention that Galbreath received "any" procedural due process. (Doc. 80, pp. 13–19). In this section, Defendants again contend that there is no "constitutionally-guaranteed minimum amount of time that must be provided to an employee before a pre-termination hearing can be held." (Doc. 80, p. 17). Further, Defendants argue that there is no pre-termination due process requirement that an employer warn an employee that they face termination. *Id.* at 16. Defendants again question this Court's citation to *Staples v. City of Milwaukee*, 142 F.3d 383 (7th Cir. 1998), in

ruling on earlier cross-motions for summary judgment.  *Id.* at 14.

But as this Court has already explained at length, there is no "one-size-fits-all" formula that dictates the procedures for notice and an opportunity to respond. *Carey*, 435 U.S. at 259.  And although a full-fledged or even mini-trial is not required, "'procedural due process rules are shaped by the risk of error inherent in the truth-finding process.'"  *Id.* (quoting *Mathews*, 424 U.S. at 344).  Based on this, the Court cannot say the above analysis or its Summary Judgment Order regarding the same issue is in error, even when couched as whether Galbreath received "any" due process.  Thus, Defendants are also not due judgment as a matter of law on this point.

## C. Applicability of *McKinney* and *Parratt*

Defendants next argue they are due judgment as a matter of law, even if Galbreath was denied a pre-termination hearing, because Galbreath's due process claim is barred by *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) and *Parratt v. Taylor*, 451 U.S. 527 (1981).  (Doc. 80, p. 19).  Defendants continue, "The Eleventh Circuit has never held that the denial of a pre-termination hearing constitutes a[ ] constitutional violation that is exempt from the requirements of *McKinney*."  (Doc. 80, p. 22).  Galbreath launches a two-front counter to Defendants' argument.  First, Galbreath contends that neither case applies because her property interest violation was complete when Defendants afforded her neither notice nor a pre-termination hearing.  (Doc. 96, p. 36).  Second, Galbreath contends that neither case applies because, as she argued, "the policy in question is itself unconstitutional as it does

not provide for notice or a hearing prior to termination." *Id.* at 37. Galbreath further contends that this Court has previously addressed these issues at summary judgment; Defendants offer "no new argument, and there have been no changes in Eleventh Circuit or United States Supreme Court precedent that would warrant a reversal at this stage of the litigation." *Id.*

The undersigned finds Galbreath's last point persuasive. This Court's Summary Judgment Order has been reviewed along with Defendants' current argument on this point. Defendants make no new argument or put additional caselaw before the Court that persuades the undersigned that its earlier ruling on the applicability of *McKinney* and *Parratt* was in error. Thus, "no constructive purpose would be served by the court reiterating the reasoning and conclusions of [an earlier] order in detail…. Summary disposition of this issue is warranted." *Costa v. Sam's E., Inc.*, No. 11-cv-000297-WS-N, 2012 U.S. Dist. LEXIS 156575, 2012 WL 5386921, at *4 (S.D. Ala. Oct. 31, 2012).

## D. Whether Galbreath's Complaint Alleges the Policy Created a Property Interest in her Employment

Defendants next contend that Galbreath's complaint does not "attempt to allege that the [Policy] rose to the level of creating a property right in her employment." (Doc. 80, p. 27). Instead, Defendants aver that Galbreath alleged that "Hale County has 'constitutionally deficient policies' that did not provide [Galbreath] with procedural due process." *Id.* Since Plaintiff did not amend her pleadings to reflect as much, Defendants insist, the issue of whether she was denied due process of a property right based upon the Policy should not have been tried.

Galbreath counters that her complaint sufficiently lays out that she alleged a property interest created by the Policy, which precludes judgment as a matter of law. (Doc. 96, p. 26). The Court agrees with Galbreath's position.

Paragraph 37 of Galbreath's Complaint states, "Hale County promulgated personnel policies that were in place at the time of [Galbreath's] termination." (Doc. 1). Paragraph 38 alleged that these policies were unconstitutional. *Id.* Galbreath's Complaint goes on to incorporate these paragraphs in her Fourteenth Amendment Due Process Claim. Further, under this Claim, Galbreath alleged that she "had a constitutionally protected property interest in her employment as County Administrator." *Id.* at 8. The Policy, she continues, was "constitutionally deficient" in that it did not provide her "notice or a sufficient opportunity for her to be heard prior to being terminated." *Id.*

This language sufficiently lays out that Galbreath alleged a property interest created by the Policy in the Complaint. To be sure, why would Galbreath allege a claim that is grounded, in part if not in all, on the Policy being constitutionally deficient if she did not contend the Policy, likewise, created a constitutionally protected property interest? The Court finds no valid reason to conclude that Galbreath would argue one but not the other. The constitutionality of the Policy would hardly be relevant if it did not create a property interest.

Moreover, if there was any doubt in the Complaint, Galbreath made it crystal clear in her response to Defendants' Motion to Dismiss that she claimed an interest in her employment based on the Policy. (Doc. 19, p. 5). Practically every filing from

there out made this point even clearer.  Thus, the Court finds Defendants are not due judgment as a matter of law.

## E. Whether the Policy Created a Property Interest

Next, Defendants take issue with the Court's determination that the Policy rose to the level of creating a property interest in Galbreath's employment.[2]  (Doc. 80, p. 28).  To the extent Defendants argue the Policy did not create a property interest for the same reasons argued at summary judgment, the Court does not address these arguments but summarily dismisses them.  *See Costa*, 2012 U.S. Dist. LEXIS 156575, at *4 (summarily dismissing a motion for judgment as a matter of law because "no constructive purpose would be served by the Court reiterating the reasoning and conclusions of [an earlier] Order in detail").  To the extent Defendants offer new arguments also raised in their Rule 50(a) motion, the Court will address each in turn.

First, Defendants aver that the third element of *Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725 (Ala. 1987), requires an employee continue employment "with actual awareness that she is doing so under the policy" in order to provide valid consideration for an implied employment contract.  (Doc. 80, pp. 28–29).  Thus, Defendants maintain, *Hoffman-La Roche* requires Galbreath subjectively believe that the Policy applies to her.  *Id.*  Defendants argue Galbreath did not provide the necessary consideration to form an employment contract because she thought the

---

[2] Whether the Policy created a property interest was a legal question for the Court to decide.  *MacKenzie v. Rockledge*, 920 F.2d 1554, 1559 (11th Cir. 1991) (citation omitted).

Policy did not apply to her. *Id.* Galbreath counters that Defendants' interpretation of *Hoffman-La Roche* is incorrect. (Doc. 96, p. 24). She argues that the third element is subjective only to the point that it requires an employee be "generally aware" of the policy in question. *Id.*

In laying out the elements necessary to establish that a personnel policy can create an implied employment contract, the Alabama Supreme Court held, in relevant part:

> In summary, we find that language contained in a handbook can be sufficient to constitute an offer to create a binding unilateral contract. The existence of such a contract is determined by applying the following analysis to the facts of each case: First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second, the offer must have been communicated to the employee by issuance of the handbook, or otherwise. Third, the employee must have accepted the offer by retaining employment after he has *become generally aware of the offer. His actual performance supplies the necessary consideration.*

*Hoffman-La Roche*, 512 So. 2d at 735 (emphasis supplied). The plain language of *Hoffman-La Roche* does not require the employee in question understand part or any of a policy apply to him or her. Instead, the employee must only "become generally aware" of the policy and continue working. It is the employee's performance that supplies consideration for the contract, not a subjective understanding. To be sure, the *Hoffman-La Roche* Court did not look to the employee's subjective understanding in that case but only whether he continued to work after being provided the policy. *Id.* at 737. Defendants offer no caselaw to support a contrary conclusion. Thus, Defendants' "subjective understanding" argument is unavailing.

Next, Defendants argue that their interpretation that the Policy did not apply to Galbreath should be given deference, citing *Chilton County Board of Education v. Cahalane*, 117 So. 3d 363 (Ala. Civ. App. 2012).[3] (Doc. 80, p. 29). In *Cahalane*, the Alabama Court of Civil Appeals concluded that "deference must be afforded to the Board's interpretation of its own policy, if that interpretation is reasonable." 117 So. 3d at 368. Therein, the court concluded that the Board's interpretation of its "zero-tolerance" drug policy was reasonable. Specifically, when the policy had no provision regarding the intent of the violator, it was reasonable for the policy to be "strictly applied" as the Board argued it should. *Id.* at 369.

The Court finds Defendants' interpretation is not due deference under *Cahalane* because Defendants' interpretation of the Policy is unreasonable. Galbreath was provided and signed for a copy of the Policy at the beginning of her employment. (Doc. 79, p. 182). Galbreath was provided with any updates to the Policy. *Id.* The Policy does not differentiate as to whom it does and does not apply. Instead, "[e]ach employee" will be provided with a copy of the Policy, "outlining all rules, regulations, policies, conditions, and benefits of County Employee employment." (Doc. 72-1, p. 8). "All new employees are required to serve a satisfactory three-months' probationary period before attaining permanent status in the county service." *Id.* at 21. "Any employee" who reaches permanent status has access to the grievance process. *Id.* at 13. "[E]mployees" who "cannot or will not

---

[3] "In the absence of definitive guidance from the [Alabama] Supreme Court, we follow relevant decisions from [Alabama's] intermediate appellate courts." *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1231 (11th Cir. 2004).

conform" to the Policy are disciplined according to a six-step graduating scale. *Id.* The June 18, 2013 disciplinary form Defendants provided Galbreath incorporates this six-step graduating scale. *Id.* at 30. Thus, the Policy and Defendants' actions indicate they intended the Policy to apply to Galbreath.

Further, each contract anticipated that Hale County would allow Galbreath to remedy any failure, neglect, or refusal to perform her duties "in accordance with [Hale] [C]ounty's disciplinary procedures" before being terminated. (Doc. 72-1, pp. 33, 37, 40). And the 2012 Contract specifically provided Galbreath "all rights, privileges and benefits that County employees have …." *Id.* at 50. This language evidences that Defendants envisioned the Policy applying to Galbreath in some instances if not every instance. Therefore, to say that the Policy is inapplicable and, therefore, creates no property interest is unreasonable and due no deference.

Defendants next argue that Galbreath was prohibited from having a property interest in her employment under the Code of Alabama § 36-27-8.2(a) (1975). (Doc. 80, p. 30). Section 36-27-8.2(a) reads, in relevant part:

> Any person who is retired under the Employees' Retirement System may perform duties in any capacity, including as an independent contractor, with any employer participating in the Employees' Retirement System … without suspension of his or her retirement allowance provided that (1) the person is not employed in a permanent full-time capacity and (2) the person's compensation from the employer in calendar year 2016 does not exceed thirty thousand dollars ($30,000).

Ala. Code § 36-27-8.2(a) (1975).

Thus, Defendants continue, "to the extent Plaintiff asks this Court to find that the policies created an 'implied contract' for 'permanent' employment, Plaintiff

would be asking this Court to imply a contract that expressly violates Alabama law." (Doc. 80, p. 30). Galbreath responds that although she was a permanent employee she was not full-time, which renders § 36-27-8.2(a) inapplicable. (Doc. 96, p. 25).

Although Galbreath focuses on only one, it appears Defendants may make any of three arguments: (1) an employee cannot hold a permanent position and draw Employees' Retirement System benefits; (2) an employee cannot be a permanent employee unless he or she is a full-time employee; and (3) Galbreath was not a permanent employee so she could not have a property interest under the Policy. Each argument is unavailing.

As to the first possible argument, the plain language of the statute makes clear that simply being a permanent employee does not suspend Employees' Retirement System benefits. Instead, three criteria must be meet: (1) permanent employment; (2) full-time employment; and (3) make more than the statutory amount per corresponding year. Thus, Galbreath does not run afoul of § 36-27-8.2(a) simply by being a permanent employee. There must be more. So even if Galbreath is a permanent employee under the policy (which the Court has already concluded she is), the trial evidence established that Galbreath was considered a part-time employee and paid less than the statutory amount for the corresponding year. (Doc. 72-1, p. 46;) (Doc. 79, pp. 112, 177).

As to Defendants' second possible argument, Defendants offer no support for the proposition that a part-time employee is precluded from being a permanent

employee under the Policy.  Instead, the Policy states that any employee who satisfactorily completes the "three-months' probationary period" attains "permanent status in county service."  (Doc. 72-1, p. 21).  Further, *Hoffman-La Roche* does not limit its holding to only full-time employees.

As to Defendants' third possible argument, they argue in a footnote that if Galbreath was part-time she was not permanent based on Plaintiff's Exhibit 10. (Doc. 106, p. 10 n. 4).  Plaintiff's Exhibit 10 is a letter drafted by Hale County's payroll clerk, Juanita Moore.  (Doc. 72-1, p. 46).  But tellingly, Defendants' agent drafted this letter after Defendants terminated Galbreath.  Viewing this evidence in the light most favorable to the non-movant, it is likely a typo, especially given that the Policy does not preclude otherwise and Galbreath was given and signed for the Policy.  Based on the foregoing, Defendants are not due judgment as a matter of law on their argument that the Policy did not create a property interest in Galbreath's employment.

## F. Whether the Express Contract Precluded an Implied Contract Under the Policy

Because of *Hoffman-La Roche*, an employer's personnel handbook can create an implied contract for employment that establishes more than "at-will" employment for an employee.  *Ex parte Amoco Fabrics & Fibers Co.*, 729 So. 2d 336, 339 (Ala. 1989).  Defendants aver that because Galbreath "asserts the existence of an express written employment contract, she cannot also attempt to assert the existence of an 'implied' employment contract based upon" the Policy, citing *Kennedy v. Polar-BEK & Baker Wildwood Partnership*, 682 So. 2d 443 (Ala. 1996).

(Doc. 80, p. 31).  Galbreath responds that *Kennedy* does not bar her assertion of both an express and implied contract because Defendants disputed the express contract's existence.  (Doc. 96, p. 22).  Further, Galbreath continues, the express contract incorporated the Policy and, therefore, the result remains that Galbreath had a property interest in her employment.  *Id.* at 23.  The Court agrees with Galbreath's position.

In *Kennedy*, the Alabama Supreme Court "recognized that where an express contract exists between two parties, the law *generally* will not recognize an implied contract regarding the same subject matter."  682 So. 2d at 447 (emphasis supplied).  As one court explained, "If the parties' dealings are covered by an express agreement, then there is no need to imply an agreement between them to ward off inequitable results."  *White v. Microsoft Corp.*, 454 F. Supp. 2d 1118, 1133 (S.D. Ala. 2006).

But as the *Kennedy* Court explained, this is *generally* the rule.  When the existence of an express contract is in dispute, an exception applies.  *Id.*  In such a case, a plaintiff can proceed with both a breach of an express contract claim and a breach of an implied contract claim.  *Id.*  (distinguishing this case from the general rule and allowing both claims to proceed because "the existence of an express contract … was highly disputed and remained a question of fact, as did the alternative existence of an implied contract").  It is for the jury to determine under which theory a plaintiff is due to recover.  *Id.*  A reviewing court evaluates whether sufficient evidence supports both forms of recovery.  *Id.*

Here, to begin with, Defendants only argue that Galbreath cannot "assert" both an express contract claim and an implied contract claim. The Court understands this argument to be that Defendants contend Galbreath cannot plead inconsistent theories of recovery. This, however, is incorrect. The law permits Galbreath to plead inconsistent theories of recovery. FED. R. CIV. P. 8(d)(3).

Whether both theories could be submitted to the jury is a different question, which depended on whether both parties agreed an express contract existed. Defendants vigorously fought the existence of an express contract every step of the way, so it was proper to submit both theories to the jury to determine damages. *See Kennedy*, 682 So. 2d at 447. And the fact that the jury returned a special verdict form in this case, as opposed to a general verdict form in *Kennedy*, is immaterial. The compensation and benefits interrogatory was a separate question for the jury to decide. *See* (Doc. 73-1, p. 5). Because of this, the Court cannot conclusively say under which theory the jury awarded Galbreath damages. *See* (Doc. 73-1, p. 5). It could have been based on an express contract or an implied contract. Therefore, in essence, it is the same as the general verdict in *Kennedy*.

To be sure, Defendants terminated Galbreath's employment without the unanimous vote the 2012 Contract requires and failed to pay her any of the money required by the 2012 Contract after her termination. Further, as discussed above, a reasonable juror could conclude that notice and an opportunity to respond were not provided. Thus, substantial evidence supports the conclusion that Defendants breached the 2012 Contract. As a result, the jury could have concluded that any

mental anguish or emotional distress damages were because Galbreath was not afforded the notice and an opportunity to respond she was due under the 2012 Contract.[4] The jury could also have concluded that any compensation and benefits damages were because of a breach of the 2012 Contract.

Alternatively, the Policy required the concurrence of the County Engineer for an employee to be terminated. (Doc. 72-1, p. 15). The County Engineer did not concur in Galbreath's termination. And, as discussed above, a reasonable juror could have concluded that Galbreath was not provided notice or an opportunity to respond before being terminated. Thus, substantial evidence supports a breach of the implied contract. As a result, the jury could have found any mental anguish, emotional distress, compensation, and benefits awarded to Galbreath were due to a violation of the Policy.

Either decision by the jury would have been reasonable, and either decision by the jury would not amount to double recovery. Prevention of double recovery is a primary goal of a holding such as *Kennedy*. *See Branch Banking & Tr. Co. v. Howard*, No. 12-0175-WS-N, 2013 U.S. Dist. LEXIS 32988, 2013 WL 951652, at *24 (S.D. Ala. Mar. 8, 2013) (finding that *Kennedy* and its progeny "make clear" that a plaintiff "*cannot recover both under*" an implied contract and express contract on the same subject matter) (emphasis supplied). Because double recovery did not occur,

---

[4] Mental anguish is generally not recoverable in a breach of contract claim. *Bowers v. Wal-Mart Store, Inc.*, 827 So. 2d 63, 69 (Ala. 2001). But Galbreath could recover for mental anguish suffered as a result of not being afforded notice and an opportunity to respond under her § 1983 procedural due process claim based on a property interest created by the 2012 Contract. *Carey v. Piphus*, 435 U.S. 247, 264 (1978).

*Kennedy* is inapplicable.

Moreover, all three contracts Galbreath presented invoke some, if not all, of the Policy. *See* (Doc. 72-1, pp. 33, 37, 40). So even if the express contract does preclude any consideration of the implied contract, the 2012 Contract incorporated the terms of the Policy. As such, the result is the same in that Galbreath still had a property interest in her employment. Thus, Defendants are not due judgment as a matter of law on this point.

## G. Whether Galbreath Mitigated her Damages

Defendants next argue they are due judgment as a matter of law on their affirmative defense of failure to mitigate damages. Defendants contend they "presented undisputed evidence that [Galbreath] made no effort to obtain any comparable work following her termination by the County Commission." (Doc. 80, p. 12). Continuing, Defendants aver that Galbreath "never testified or presented any evidence demonstrating any reasonable effort to obtain work after her termination." *Id.* Galbreath responds that the record amply establishes why it was not reasonable for Galbreath to seek out other employment. (Doc. 96, p. 41).

A terminated employee has a duty to mitigate damages and make reasonable efforts to obtain "substantially comparable" employment. *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991) (superseded by statute on other grounds). Failure to mitigate such damages, however, "is an affirmative defense, and as such," each defendant bears the burden of proving. *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1348 (11th Cir. 2000). If "an employer proves that the employee has not

made reasonable efforts to obtain work, the employer does not have to establish the availability of substantially comparable employment." *Weaver*, 922 F.2d at 1527.

To begin, to the extent Defendants attempt to argue Galbreath "never testified or presented any evidence demonstrating" her reasonable attempts to secure additional employment, this is in error. Defendants, alone, bore the burden to produce evidence that showed Galbreath failed to make a reasonable effort.

Considering the evidence Defendants presented on this issue, the following exchange transpired on cross-examination:

Q [Defendants' Counsel]: Now, even after you were terminated in Hale County, you kept on working as county administrator in Lawrence County; correct?

A [Galbreath]: Yes, sir.

Q: But in 2014 you were terminated by the Lawrence County Commission, weren't you?

A: Yes, sir.

Q: And you sued Lawrence County, didn't you?

A: Yes – I – yes, sir.

Q: Have you applied anywhere else in Alabama –

A: No.

Q: – to get a job? Let me finish my question. Have you applied anywhere else in Alabama to get a job as a county administrator since you were terminated from Lawrence County?

A: No, sir.

Q: Have you applied – and I've got to cover all my bases here – have you applied to anywhere else to be a county administrator since your termination from Hale County?

A: No, sir.  Because I did not think there was no use in me trying.

(Doc. 79, pp. 216–17).

Evaluating this limited exchange in the light most favorable to the non-moving party, the Court cannot find that reasonable jurors would all concur Galbreath made no reasonable efforts to mitigate her damages.  To begin with, the scope of defense counsel's questioning was rather specific: Did Galbreath *apply* anywhere else?  This limited Galbreath's efforts to actually submitting applications with different Alabama County's that, presumably, had open county administrator positions.  The focused nature of this questioning failed to consider any of the "leg work" that goes into submitting an application (*e.g.*, reaching out to contacts, creating a resume, securing references, identifying open or available positions, etc.).  Of the pre-application tasks, identifying open or available positions is paramount.  Did Galbreath think there was "no use" in putting out applications because her search turned up no open positions?  It was reasonable for the jury to conclude from Galbreath's testimony that she wanted to work and reasonably attempted to secure comparable employment but did not actually send out applications because, after searching, she found no open positions.  If she meant otherwise, Defendants failed to clarify what Galbreath's response meant.

Additionally, the jury could have interpreted Galbreath's "would have done no good to apply" response as her saying that applying would be futile.  Reasonable efforts to mitigate damages do not necessarily include futile efforts.  *See Ross v. Twenty-Four Collections, Inc.*, 681 F. Supp. 1547, 1554 (S.D. Fla. 1988) (finding an

employee's lack of diligence did not reduce her back pay where any attempts to secure employment were rendered futile by the employer's actions). Galbreath was at the end of her career and on the tail end of two turbulent terminations. The number of counties in Alabama is finite; therefore, the number of county administrator positions is limited. Evidence was presented at trial leading to the conclusion that county commissions and commissioners, at large, share information regarding employees. *See* (Doc. 79-1, p. 43). It was reasonable that word of the events surrounding both terminations got around. There was even a newspaper article about one of Galbreath's terminations. (Doc. 79, p. 155). Galbreath's work history, the limited market for county administrator positions in Alabama, and how Galbreath's application would be received were proper considerations for the jury. *See Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983) ("The reasonableness of the effort to find substantially equivalent employment should be evaluated in light of the individual characteristics of the claimant and the job market.") A reasonable juror could have inferred from all of this and her answer that Galbreath made reasonable efforts but found she was blackballed. Thus, actually applying would have been futile.

Galbreath was not required to be successful in her mitigation efforts. She was only required to make a reasonable effort. It was Defendants' burden to ferret out what Galbreath's "no good to apply" response entailed; they did not. The Court will not substitute its judgment for the jury's. Given the above, reasonable jurors could have found Defendants failed to prove Galbreath made *no reasonable efforts* to

find substantially comparable work merely because Galbreath did not do one of the many things that could encompass reasonable efforts to secure new employment.

Lastly, if the jury reached either of the above conclusions (and they reasonably could have), Defendants did not show that substantially comparable work existed within the relevant area. Defendants are not due judgment as a matter of law.

**H. Whether the Written Contract Created a Property Interest**

Citing *Estes v. Tuscaloosa County, Alabama*, 696 F.2d 898 (11th Cir. 1983), Defendants argue that a contract that can be terminated without cause falls outside the protections of the Due Process Clause of the Fourteenth Amendment. (Doc. 80, p. 32). The 2012 Contract, Defendants continue, could be terminated without cause and, therefore, did not create a property interest protected by the Fourteenth Amendment. *Id.* Galbreath responds that under the 2012 Contract she was due five years' salary that could not be refused except for cause, which constitutes an individual entitlement creating a property interest. (Doc. 96, p. 27).

"The hallmark of property, the [Supreme] Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982). If a party can cancel a contract at its convenience and without cause, no constitutionally protected property interest is created by the contract. *Econ. Dev. Corp. v. Stierheim*, 782 F.2d 952, 954 (11th Cir. 1986). As it relates to a public employee, a property interest can exist in continued employment or continued pay. *Estes*, 696 F.2d at 900–01. If the

property interest is based on continued pay as a result of the employment, there must be some "statute, rule, or understanding upon which [a] plaintiff" could rely for the entitlement. *Id.*

Here, the Court finds Defendants fail to consider the entire scope of Galbreath's entitlement under the 2012 Contract (or either of the previous two for that matter). Article III articulates that, as compensation for the Contract, Galbreath "shall initially receive a salary of $22,000 per year. This salary shall be increased by an amount equal to raises in accordance to salary set by the Retirement Systems of Alabama." (Doc. 72-1, p. 33). Further, Galbreath would receive additional benefits commensurate "with other county employees." *Id.* These were to continue for the term of the 2012 Contract.

Paragraph A of Article 4 sets forth the only three scenarios upon which Defendants may "discharge Employee and terminate" the 2012 Contract "for cause":

> 1. [Galbreath] has failed, neglected[,] or refused to perform her duties under this Agreement, which failure, neglect[,] or refusal shall not have been remedied by [Galbreath] in accordance with County's disciplinary procedures; or
>
> 2. [Galbreath] has engaged in malfeasance, dishonesty[,] or gross misconduct (a) in the performance of her duties to County, or (b) that has the effect of injuring the business or reputation of County or its affiliate; or
>
> 3. [Galbreath] has committed a material breach of this Agreement[.]

*Id.* at 33. Under Paragraph D of Article IV, only under one of these "for cause" reasons may Defendants avoid paying Galbreath the entire compensation and benefits she is due according to Article III. *Id.* Otherwise, Paragraph F explains:

> Galbreath shall be entitled to receive, in full discharge of all County's obligations to [Galbreath], [her] full compensation, benefits[,] and expense reimbursements due and payable to [Galbreath] under the terms of this Agreement, including any salary increase [Galbreath] would have been due under said Contract for the remainder of the contract term.  Said payments shall be made in equal monthly installments for the total number of months remaining on the contract term at the time of the termination.

*Id.*

Under this language, Galbreath had a continuing entitlement in receiving her compensation, benefits, and expense reimbursements.  These payments would continue each month until the contract term expired.  The only way Defendants could avoid paying Galbreath all payments was by terminating the 2012 Contract for cause based on the reasons in Paragraph A of Article IV.  Defendants could not avoid the payments due under the contract at their convenience, which differentiates this case from those cited by Defendant.  Therefore, Galbreath possessed a property interest based on the 2012 Contract.

Alternatively, Defendants argue that Galbreath's contract contained a clause stipulating that payment under the contract is her "sole and exclusive remedy in connection with termination of his [sic] employment under this Agreement."  (Doc. 105, pp. 13–14).[5]  Thus, Defendants continue, "even if [Galbreath's] theory of an enforceable contract holds true, her 'sole and exclusive remedy' would be a breach of contract action to recover the severance payment, not a Section 1983 claim."  *Id.* at

---

[5] Defendants' citation for this argument references the 2012 Contract for Hale County EMA Director Russell Weeden.  *See* (Doc. 105, p. 14) (citing Doc. 72-1, p. 51).  The Court presumes Defendants cited Weeden's contract in error and meant to cite Galbreath's 2008 Contract.  *See* (Doc. 72-1, p. 37).

14.

The Court finds this argument without merit and inconsistent with the jury's verdict. If the "sole and exclusive remedy" clause applies, this means the jury found the 2008 Contract to be the valid contract because the 2012 Contract does not contain this clause. The 2008 Contract expired November 25, 2013. (Doc. 72-1, p. 36). Therefore, after its expiration, it was not the sole and exclusive remedy upon which the jury could award damages; the jury could have awarded Galbreath damages based on her due process claim. This could be consistent with the jury verdict.

On the other hand, and more likely the case, the jury found the 2012 Contract to be valid. As previously noted, the 2012 Contract contains no such "exclusive remedy" language. Therefore, the 2012 Contract was not Galbreath's sole means of recovery.

Given this, Galbreath possessed a property interest based on the 2012 Contract, and Defendants are not due judgment as a matter of law.

## I. Whether Galbreath Produced Evidence Supporting Damages

Defendants argue Galbreath failed to show "that her termination was an obvious mistake that would have been avoided if only she had been afforded a greater pre-termination opportunity to be heard." (Doc. 80, p. 33). In other words, Defendants allege that Galbreath failed to show damages flowing from the failure to provide greater pre-termination due process. *Id.* At best, Defendants insist, "the evidence is insufficient to support more than nominal damages" for Galbreath's due

process claim. *Id.* at 33. Defendants contend Galbreath cannot establish more because her termination was justified. *Id.* Citing *Carey v. Piphus*, 435 U.S. 247 (1978), Defendants maintain that Galbreath "may not recover compensatory damages for a justified termination." *Id.*

Galbreath responds that Defendants' "obvious mistake" argument for evaluating damages misstates *Carey* (Doc. 96, p. 43), and that sufficient trial evidence establishes that a reasonable juror could find her termination unjustified. *Id.* at 44. The Court agrees with both.

Section 1983 does not presume damages for a due process claim. Instead, damages for a due process claim are meant to compensate for injuries caused by the failure to provide the required procedural protections. *Carey*, 435 U.S. at 254–55. These procedural protections are not meant to thwart the deprivation of a right. *Id.* at 259. Instead, they protect against "the mistaken or unjustified deprivation of life, liberty, or property." *Id.* If no actual injury is shown based on a lack of procedure, only nominal damages are recoverable. *Id.* at 266.

Even if an injury is shown by the failure to provide due process, a plaintiff is not entitled to recover damages to compensate him or her if the deprivation is justified. *Id.* at 260. In such a case, "the failure to accord procedural due process could not properly be viewed as the cause of the" deprivation. *Id.* If the rule were otherwise, "an award of damages for injuries caused by the [deprivation] would constitute a windfall, rather than compensation," for a plaintiff. *Id.* But the justification defense does not require a plaintiff to show a deprivation was an

"obvious mistake" as Defendants contend. Instead, it must be shown that the violation of due process occurred and the deprivation was *unjustified*. *Id.* at 266–67.

When asked whether Galbreath "suffered some actual compensable injury caused by the failure to give her procedural due process," the jury answered, "Yes." (Doc. 73-1, p. 3). Substantial evidence supports the jury's answer. The disciplinary form was conclusory and provided no factual support. Galbreath did not know that her job was on the line when the form was read. Evidence supports the conclusion that she was afforded no meaningful opportunity to respond, if she was allowed to respond at all. Without either of these protections, a reasonable juror could have concluded that Galbreath's termination posed a serious risk of an erroneous decision. The testimony of at least two commissioners supports this position. With the necessary procedures, Galbreath could have addressed these doubts, which led to a loss in compensation and benefits. Thus, Galbreath established damage flowing from the pre-termination procedure.

To this, however, Defendants contend Galbreath's termination was justified and that Galbreath can recover only nominal damages.

But when asked whether Galbreath's termination was justified, the jury answered, "No." (Doc. 73-1, p. 4). Substantial evidence exits to support this verdict. To begin, Defendants argued at length that Galbreath was absent from work. But trial testimony and exhibits established that Galbreath had no set office hours. And one of the same commissioners that said Galbreath was absent testified that he

stayed away from the office. (Doc. 79-1, p. 61). Which begs the question: how could he know Galbreath was absent? Commissioner Anderson testified that Galbreath was the "face of the commission" and should have physically been present. (Doc. 79-1, p. 44). But the jury could have reasonably rejected this point. If having a county administrator physically present is important, it stands to reason that Defendants would have hired someone to replace Galbreath. Defendants never hired a new county administrator.

Additionally, despite Defendants' evidence otherwise, several co-workers testified that they did not witness Galbreath perform any of the actions enumerated in the disciplinary form. (Doc. 79, pp. 117–19); (Doc. 79-1, pp. 237–38). It was the jury's duty to weigh this contradicting evidence and establish which witness was more credible on each point. *Adler*, 137 F.3d at 1340. Defendants are not due judgment as a matter of law.

Next, Defendants argue Galbreath presented "no corroborating evidence to support her recovery of damages for emotional distress" or mental anguish. (Doc. 80, p. 35). Further, Defendants maintain, Galbreath "failed to identify any emotional distress flowing from the alleged insufficiency of her pre-termination hearing." *Id.* Instead, Defendants contend any emotional distress or mental anguish Galbreath claims was simply caused by being fired. *Id.* at 36).

Galbreath parries that she specifically testified to the negative impact the due process violation had on her and how this was directly associated with the constitutional violation. (Doc. 96, p. 45–46). Specifically, Galbreath contends she

was embarrassed, could not sleep, suffered stress, and ultimately suffered a shingles breakout as a result. *Id.* at 46.

Generally speaking, emotional distress damages need not be exactly calculated in order to be recoverable. *Akouri v. Fla. DOT*, 408 F.3d 1338, 1345 (11th Cir.), *vacated in part on other grounds*, 2005 U.S. App. LEXIS 11427 (2005). But emotional distress damages are not presumed from a constitutional violation. *Id.* (citing *Carey*, 435 U.S. at 263–64). Instead, "such damages are customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Id.* (citation omitted). A plaintiff's testimony may provide the necessary evidence to support such an award. *Id.* (citing *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)). But such testimony "must establish that the Plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award" of emotional distress damages. *Id.* (citation omitted). Once a jury has awarded damages for emotional distress, the award is deferentially reviewed because "the harm is subjective and evaluating it depends considerably on the demeanor of the witness." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999).

> The following exchange took place on direct examination:
>
> Q [Plaintiff's Attorney]: Is there any – I believe you just explained notice. Is there any emotional distress you've had from not having the opportunity … from not having the opportunity to be heard?
>
> A [Galbreath]: Well, there's the stress on – on your health – on my health, part of it, because it automatically is bad for your nerves. You

can't sleep. I had a case of shingles after this situation. So it's just – you have to pick up with life and go on, but it is very stressful.

…

Q: Would you liked to have told your side of the story?

A: Yes, sir.

Q: And how would that have affected anything?

A: Well I would have like for it to have been put in the newspaper, because there was nothing ever put in the newspaper, the reason that I was able to leave that county, and the part of my children at home had to suffer the consequences when they went to work: "Your mother did something wrong." And my children – my son was a deputy in Hale County. And he had to go ahead and finish out his term down there, that his mother got fired. And my daughter had to go into work facing the fact that "your mother got fired from Hale County, she did not do her job." So it humiliated my family, which automatically hurt my feelings.

(Doc. 79, p. 157).

Reviewing this testimony in the light most favorable to the non-moving party, the Court finds Defendants are not due judgment as a matter of law. Galbreath articulated demonstrable emotional distress going beyond mere conclusory statements. The stress she suffered caused sleep lose and a shingles outbreak. Galbreath was not required to produce documented medical records on these points. Here testimony sufficed, and it was for the jury to determine her credibility. She offered this testimony in response to being asked if she could attribute any emotional distress to the constitutional violation. These harms were a genuine injury resulting from the constitutional violation. *Akouri*, 408 F.3d at 1345.

Additionally, when Galbreath's final statement is read in the full context of the line of questioning, it becomes apparent what her response was directed to:

what being afforded due process would have done. It would have allowed her the opportunity to meaningfully respond, which would have prevented her humiliation. Thus, substantial evidence exists to support the jury's award of emotional distress damages.

Defendants also contend that the Court should reverse the award of emotional distress damages because Galbreath cannot recover such damages on her wrongful termination claim under Alabama law. In support, Defendants cite the Alabama Supreme Court decision of *Hobson v. American Cast Iron Pipe Company*, 690 So. 2d 341 (Ala. 1997). Indeed, the law in *Hobson* is as Defendants contend; however, *Hobson* does not provide Defendants the relief requested. There is no indication that the jury awarded Galbreath emotional distress based on the wrongful termination claim instead of the due process claim. *See* (Doc. 73-1, pp. 4–5).

Moreover, as Defendants proposed and the Court accepted, a claim of wrongful termination under Alabama law is decided in the same manner as a Fourteenth Amendment due process claim. (Doc. 61, p. 25) (citing *Limbaugh v. Johnston*, 393 So. 2d 963, 965 (Ala. 1979)). The Court instructed the jury as such. (Doc. 79-1, p. 111). Further, the Court provided a copy of the verdict form to both parties and reviewed it with both parties before it was provided to the jury. Defendants failed to raise any objection to the verdict form in the regard they now argue at the charging conference. And the interrogatory charged to the jury is strikingly similar to the interrogatory proposed by Defendants. *Compare* (Doc. 61,

p. 33) *with* (Doc. 73-1, pp. 5–6).  To now cry error for instructing the jury as requested or in the absence of an objection is improper.

Lastly, Defendants argue that Galbreath failed to pursue any post-termination remedies under the Policy or in state court.  (Doc. 80, p. 36).  Therefore, under *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994), "she cannot claim that she suffered any damages by the alleged failure to provide a pre-termination hearing." *Id.* at 37.  This argument has been made and analyzed at length throughout this proceeding.  Such analysis is, again, incorporated for efficiency purposes.  The Court remains unconvinced that *McKinney* applies as Defendants contend.  Therefore, the Court denies judgment as a matter of law on this point.

## J. Whether Galbreath Can Bring a Wrongful Termination Claim

Since a claim of wrongful termination under Alabama law is decided in the same manner as a Fourteenth Amendment due process claim, Defendants contend they are due judgment as a matter of law because Galbreath was not actually denied pre-termination due process.  (Doc. 80, p. 37).  Alternatively, Defendants contend, as they have several times before, "no such cause of action exists under Alabama law." *Id.* at 38.  Galbreath responds that the Court has already ruled on this same argument on two separate occasions, and Defendants raise no new basis or caselaw that calls for the Court to reverse course now.  (Doc. 96, pp. 48–51).

For the most part, Galbreath is correct.  Defendants made most of the present arguments in their Motion to Dismiss and Motion for Summary Judgment. *Compare* (Doc. 7, pp. 7–8) *and* (Doc. 26, pp. 28–30) *with* (Doc. 80, pp. 37–41).  To the

extent Defendants make no new arguments, the Court is unpersuaded its earlier reasoning or conclusions are in error. "[N]o constructive purpose would be served by the court reiterating the reasoning and conclusions of [an earlier] order in detail…. Summary disposition of this issue is warranted." *Costa*, 2012 U.S. Dist. LEXIS 156575, at *4.

To the extent Defendants raise a new argument for judgment as a matter of law, Defendants contend the caselaw Galbreath relies upon is distinguishable because each "involved an express promise of a termination hearing – either by statute or by handbook." (Doc. 80, p. 41). Galbreath, Defendants contend, is unable to cite a portion of the Policy or the 2012 Contract the specifies "any particular type of pre-termination hearing [ ] [Galbreath] did not receive." *Id.* "Thus, she cannot squeeze within the line of authority which she alleges creates a common law tort for wrongful termination." *Id.*

Under the language of the Alabama Supreme Court, the Court finds Defendants' position unpersuasive. Specifically, in *Limbaugh v. Johnson*, the Alabama Supreme Court found a state law claim of wrongful termination to exist based on an injury caused by a failure to dismiss an employee "in accord with due process of law requirements." 383 So. 2d 963, 965 (Ala. 1981) (citing *Jefferson Cnty. v. Reach*, 368 So. 2d 250 (Ala. 1978)). The *Limbaugh* Court did not limit its decision based on a property interest that was deprived contrary to a statute or handbook. Instead, such a claim applied because the employee possessed a property interest deprived in violation of the due process of law. And in *Limbaugh*, pre-termination

due process protections "include[d] at a minimum: (1) written notice of the reasons for termination and (2) an effective opportunity to rebut those reasons." *Id.* at 964. What this means is that wrongful termination is based on a failure to provide notice and an opportunity to respond in accordance with due process when a property interest in employment exists, not just based on a violation of a handbook or statute. Given this, the Court finds Defendants' contention unavailing. Defendants are not due judgment as a matter of law because, as explained above, a reasonable juror could conclude that a due process violation occurred.

## K. Whether Galbreath Exhausted Administrative Remedies

Defendants move for judgment as a matter of law based on Galbreath's alleged failure to exhaust administrative remedies before bringing suit. (Doc. 80, p. 41). Defendants contend that the Policy spells out a four-step grievance procedure that should have been followed but was not. *Id.* "Because [Galbreath] did not attempt to make use of the grievance procedure, she is barred from seeking judicial review of her termination." *Id.* Galbreath responds that failure to exhaust an administrative remedy is an affirmative defense. (Doc. 96, p. 46). Galbreath maintains that Defendants did not plead this defense in their Answer and, therefore, cannot now raise it for the first time. *Id.*

Indeed, failure to exhaust an administrative remedy is an affirmative defense. *Dougherty Cnty. Sch. Sys. v. Bell*, 694 F.2d 78, 80 (5th Cir. 1982); *see also Williams v. Runyon*, 130 F.3d 568, 573 (3rd Cir. 1997) ("In Title VII actions, failure to exhaust administrative remedies is an affirmative defense in the nature of

statute of limitations.")  "The pleading of an affirmative defense is mandated by

Federal Rule [of] Civil Procedure 8(c) to be presented in a responsive pleading, and

a party waives its right to advance an affirmative defense by failing to assert it as

such."  *Steger v. GE*, 318 F.3d 1066, 1077 (11th Cir. 2003).

Here, Defendants did not raise this affirmative defense in their Answer.  The

first time such an argument was put forth by Defendants was in their Rule 50(a)

Motion for Judgment as a Matter of Law.  (Doc. 69, p. 35).  This argument is now

renewed.  It, therefore, would seem Defendants waived the right to raise this

defense.

Defendants counter that this affirmative defense was properly raised and

tried by implied consent of Galbreath.  (Doc. 105, p. 14).  Defendants contend,

"Implied consent may be found where a party fails to object to presentation of

evidence on [an] affirmative defense."  *Id.* (citing *Steger*, 318 F.3d at 1077).  They

continue that sufficient evidence was presented at trial establishing Galbreath

failed to exhaust administrative remedies without objection.

At trial, the following brief exchange took place:

Q [Defendants' Attorney]: Section 6 of the disciplinary procedure says
after termination "an appeal can be made following the steps in
grievance procedure"; correct?

A [Galbreath]: Yes, sir.

Q: Did you ever file a grievance?

A: I – I don't – if I did, my attorney did.

Q: Okay.  You don't remember ever doing it, do you?

A: I never did receive anything from them on my termination.

Q: Did you ever file a grievance?

A: No, sir, because I never got a termination letter.

(Doc. 79, p. 185).

This language establishes that Defendants presented, without objection, at least some type evidence that Galbreath might have failed to exhaust any administrative remedy. But the handful of questions in this case are materially distinguishable from *Steger* to the extent the Court cannot say exhaustion was tried by implied consent. In *Steger*, the defendant "raised and discussed" a "salary retention program" at length in the pretrial conference, which was the contested affirmative defense in an Equal Pay Act claim. 318 F.3d at 1077. Further, sufficient evidence supporting the defense was presented at trial and the plaintiff did not object. *Id.* But here, the question of exhausting an administrative remedy was not discussed pretrial and only sparse evidence was presented. Moreover, Defendants did not request the Court instruct the jury on this affirmative defense when they requested that the jury be charged with several other affirmative defenses.

But even if this affirmative defense was sufficiently raised and tried by implied consent, the Court's reasoning does not stop there. The Alabama Supreme Court has identified several exceptions to the exhaustion doctrine. *See Goolsby v. Green*, 431 So. 2d 955, 958 (Ala. 1983). One such exception applies when "exhaustion of an administrative remedy would be futile." *Id.* Indeed, the Alabama

Court of Civil Appeals' case Defendants cite in support of judgment as a matter of law recognized this exception. *See Hall v. Dothan*, 539 So. 2d 286, 289 (Ala. Civ. App. 1988). Galbreath contends that exhaustion would have been futile in her case.

Under the Policy, exhaustion would require Galbreath maneuver through a four-step process, which ended with the same body that terminated her. *See* (Doc. 72-1, pp. 13–14). Step One required Galbreath discuss her termination with Judge Crawford, her immediate supervisor. If Step One was unsuccessful, Step Two required Galbreath file a complaint with "the Department Head." Presumably, again, this is Judge Crawford. If Step Two was unsuccessful, Step Three would have Galbreath appeal to the Personnel Review Board, which rendered a recommendation. Step Four required the Hale County Commission do one of three things with the recommendation: (1) affirm the recommendation of the Personnel Review Board and adopt it; (2) modify the recommendation of the Personnel Review Board and adopt it; or (3) reject the recommendation of the Personnel Review Board. *Id.* "Step Four shall be the final step in attempting through administrative procedures to resolve [any] grievance." *Id.*

Outlining these steps, it can be seen that Galbreath would have appealed her termination to those who initiated it or approved it at almost every step of the process. Step One and Step Two would have been unavailing because it was unlikely Judge Crawford would have reversed course after he voted in favor of Galbreath's termination on June 18, 2013. The only uncertainty is associated with what decision would be made by the Personnel Review Board because the members

of this board are unknown. But what is known is that any decision by the Personnel Review Board must be affirmed, modified, or rejected by the Hale County Commission. This renders the Personnel Review Board's decision somewhat irrelevant. Given the evidence adduced at trial, the Court can say that reasonable jurors could have found that the Hale County Commission would have rejected any favorable ruling for Galbreath. This renders the grievance procedure futile. *See Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1556 (11th Cir. 1985) ("Nor will exhaustion be required if the claim clearly will be denied ….")

Additionally, Defendants' citation to *Ogburia v. Cleveland*, 380 F. App'x 927 (11th Cir. 2010), is unavailing. There is no indication that Ogburia argued or the court evaluated whether any administrative remedy in that case would have been futile, which Galbreath squarely raised. Given this, the Court finds that Alabama's futility exception to exhausting an administrative remedy applies. Defendants are not due judgment as a matter of law on this point.

## L. Whether Defendants Breached the Contract

Defendants contend they are due judgment as a matter of law on Galbreath's breach of contract claim for two reason. As for their first reason, under *Shores v. Elmore County Board of Education*, 3 So. 2d 14 (Ala. 1941), and *Willett & Willett v. Calhoun County*, 117 So. 311 (Ala. 1928), Defendants aver that Judge Leland Avery could not bind successor government officials with the 2012 Contract. (Doc. 80, pp. 42–43).

Galbreath responds that Defendants' caselaw is distinguishable. (Doc. 96, p.

53).  Further, she urges that "this is not a case where an 'old body' bound a 'new body.'"  *Id.*  "The commissioners who voted for the 2012 Contract were the exact same commissioners who voted to terminate" Galbreath.  *Id.* (emphasis omitted).  Only the probate judge changed.  *Id.*  Galbreath continues that the 2012 Contract did not bind the commission from firing Galbreath but only enumerated certain procedures to do so.  *Id.*

The Court agrees that Defendants' caselaw does not lend the support they suggest.  To be sure, the *Shores* Court found that a county superintendent of education was an executive officer and, by law, advisor to the county board of education during his term in office.  *Shores*, 3 So. 2d at 14.  Given this, the court drew support from *Willett* and found the superintendent's "position in that regard not less important nor intimate than that of an attorney."  *Id.* at 16.  Thus, the board of education could not enter into a contract guided by the previous superintendent that "deprived itself of the advice of" the incoming superintendent.

Here, the position of Hale County Probate Judge does not equate with the position of superintendent in *Shores.*  Although the Hale County Probate Judge was the chair of the county commission, the probate judge in Hale County merely "administer[s] and direct[s] the flow of the [county commission] meeting."  (Doc. 79, p. 86).  The Hale County probate judge does not take part in a vote unless there is a tie.  *Id.* at 109.  Instead, the bulk of the probate judge's duties fall in other areas (*e.g.*, license renewal, probate of wills, vehicle titling and registration, marriage license, etc.).  Given this, Judge Avery did not deprive the commission of important

48

or intimate advice of the incoming probate judge as it relates to personnel matters. Even so, Judge Crawford could still "advise" termination under Galbreath's 2012 Contract. The only difference is that there must be unanimous consent for the termination to be effective.

*Willett* is also inapposite. The *Willett* Court reasoned that the succeeding board "should at all times be free to select its own confidential legal advisor." 117 So. at 311. Thus, the preceding board in *Willett* could not enter into a contract with an attorney that extended into the term of the succeeding board. The sanctified attorney/client relationship does not equate to the relationship between the Hale County Commission and its county administrator in this case. Under the 2012 Contract and the Code of Alabama § 11-3-18 (1975), Galbreath's duties were administrative in nature (*e.g.*, preparing a budget, keeping and recording minutes, maintaining records, etc.) or even managerial in nature. Conversely, in the Alabama Supreme Court's own words, an attorney is a "confidential legal advisor." Moreover, if the county administrator position was such an important position, it begs the question as to why Hale County did not replace Galbreath after her termination.

Lastly, as Galbreath points out, evidence indicates that, although Judge Avery signed the contract, he and a preceding commission did not bind a successor commission with the 2012 Contract. Unrecorded meeting minutes recovered from Galbreath's work computer show, save for Judge Crawford, the same county commission that voted to terminate the 2012 Contract on June 18, 2013, is the same

county commission that voted to approve it on November 27, 2012. *Compare* (Doc. 72-1, p. 29) *with* (Doc. 72-1, p. 54). A preceding commission did not deprive a successor commission of a personnel decision as Defendants contend. Thus, *Shores* and *Willett* are distinguishable on their facts.

As to Defendants' second point for judgment as a matter of law on Galbreath's breach of contract claim, they maintain that a county administrator's first duty under the Code of Alabama § 11-3-18 (1975) is to "keep and record minutes of all County Commission meetings." Defendants aver that Galbreath admitted that she did not "record" the commission meeting minutes for almost a year but merely "kept" electronic versions on her work computer. (Doc. 80, p. 43). Thus, Defendants continue, Galbreath did not perform under the 2012 Contract and cannot recover for this claim. *Id.* Galbreath counters that evidence establishes that the normal practice was to periodically print off and permanently record the minutes, which were electronically stored on her computer. (Doc. 96, p. 54). Further, she insists that Defendants breached the contract when they terminated her employment without unanimous approval and failed to pay her afterwards. *Id.* at 55.

In order to recover for breach of contract under Alabama law, a plaintiff must satisfy three elements: (1) that a contract existed; (2) that the defendant breached the contract; (3) that the plaintiff performed under the contract; and (4) resulting damages. *Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009) (citation omitted). Any breach must be material in order to be recoverable or prevent

50

recovery. *Sokol v. Bruno's, Inc.*, 527 So. 2d 1245, 1247–48 (Ala. 1998). "A material breach is one that touches the fundamental purposes of the contract and defeats the object of the parties in making the contract." *Id.* at 1248. Whether a breach is material or essential to the contract is frequently a question of fact determined by the jury. *Harrison v. Family Home Builders, LLC*, 84 So. 3d 879, 889 (Ala. Civ. App. 2011) (citing *Birmingham News Co. v. Fitzgerald*, 133 So. 31 (Ala. 1931)).

Here, a reasonable juror could conclude that Galbreath did not breach the 2012 Contract because of the minutes and, if she did, that it was not a material breach. Galbreath testified that she took meeting minutes at each commission meeting. (Doc. 79, p. 139). These minutes were then typed into her work computer. *Id.* at 133. The unrecorded minutes from at least one of the meetings in question were produced at trial from this computer. (Doc. 72-1, p. 54). After entry into the computer, the media and commissioners were given a copy of the minutes. (Doc. 79, p. 138). The commission would then approve the computer copy for permanent recordation. *Id.* Galbreath testified that prompt permanent recordation was problematic due to difficulties with printing off the large minute sheets and the unavailability of the commissioners to sign the minutes. *Id.* at 138–39. Therefore, she would schedule a time to print several at once and have the commissioner present to sign. Given the problems Galbreath stated she had with permanently recording the meeting minutes, a reasonable juror could conclude that Galbreath did not fail to perform under the 2012 Contract by periodically printing the minutes she took at each meeting and kept on her computer.

At least one other witness testified that printing and permanently recording meeting minutes were not as difficult as Galbreath contended, which could render periodic printing unnecessary. But this same witness also testified that after Galbreath's termination Hale County switched to a smaller meeting minutes book, which made it easier to print off minutes for permanent recordation. (Doc. 79-1, p. 263). The jury could have inferred from Hale County switching to a different minute book that problems did exist and the commission was aware of difficulties. Either way, which account is more credible is not for the Court to decide. *Adler*, 137 F.3d at 1340.

Even more, although Alabama law requires Galbreath keep and record the minutes, the law does not articulate a time within which a county administrator must "record" meeting minutes. *See* Ala. Code § 11-3-18 (1975). Given this, there is no showing that Galbreath's periodic printing system is violative of the law.[6]

Further, Defendants had access to Galbreath's work computer after her termination. Defendants could have printed the unrecorded meeting minutes off Galbreath's work computer, signed them, and placed them in the permanent meeting minute book. But when Hale County was audited almost three years after Galbreath's termination, the minute book was still incomplete. (Doc. 72-2, p. 25). These same meeting minutes were still unrecorded at trial. (Doc. 79-1, p. 52). Given that Defendants did not permanently record the missing meeting minutes, a

---

[6] Also, Alabama's Open Meetings Act does not put a specific time frame on making meeting minutes available to the public. *See* Ala. Code § 36-25A-4 (1975). Instead, they must be available "as soon as practicable after approval." *Id.*

reasonable juror could have concluded that, if Galbreath did not perform under the 2012 Contract, it was not a material nonperformance such that it barred her recovery. Defendants are not due judgment as a matter of law on Galbreath's breach of contract claim.[7]

### III. NEW TRIAL

**A. The New Trial Standard**

A district court may, "on motion, grant a new trial on all or some of the issues" upon a jury's verdict "for any reason for which new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). A new trial has been granted within the Eleventh Circuit for the reasons Defendants now seek. *See, e.g.*, *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312 (11th Cir. 2013) (explaining that a new trial may be granted if "the verdict is against the great—not merely the greater—weight of the evidence") (citations omitted); *Gowski v. Peake*, 682 F.3d 1310 (11th Cir. 2012) (explaining that a new trial may be granted when jury instructions provided are both contrary to law and prejudicial). Although the standard for each of reason differs, they echo that a new trial should not be granted "unless the error or circumstances at issue affected substantial rights or caused substantial prejudice, so that it was not merely harmless." *Starbuck v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 3d 1281, 1293 (M.D. Fla. 2015).

A district court is granted broad discretion in ruling on a motion for new trial.

---

[7] To the extent Galbreath argues Defendants failed to perform under the 2012 Contract in her response, the Court does not address this argument as it is not a ground upon which Defendants move for judgment as a matter of law.

*See, e.g.*, *Hessen v. Jaguar Cars, Inc.*, 915 F.2d 641, 644 (11th Cir. 1990). A ruling on a motion for new trial is reviewed for abuse of discretion. *Finnerty v. Stiefel Labs., Inc.*, 756 F.3d 1310, 1322 (11th Cir. 2014). This being said, the remedy of granting a motion for new trial "is sparingly used." *Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 375 (1st Cir. 2004) (citation omitted).

## B. Whether Galbreath's Mitigation Efforts Require a New Trial

Defendants maintain that the jury verdict is contrary to the evidence and law as it relates to Galbreath's mitigation of damages after her termination. (Doc. 80, p. 44). As in their motion for judgment as a matter of law on this issue, Defendants contend that Galbreath admitted in her testimony that "she has not attempted to apply for any work since" her termination. *Id.* Further, Defendants continue, Galbreath offered "no testimony or evidence to establish that she has made reasonable efforts to obtain work since her termination." *Id.* at 45. Galbreath argues that a new trial is improper on this issue for the same reasons judgment as a matter of law is improper. (Doc. 96, p. 56).

The Eleventh Circuit has repeatedly warned, "'[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence.'" *Lamonica*, 711 F.3d at 1212–13 (quoting *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1200 n.16 (11th Cir. 2009)). This is so "because it is critical that a judge does not merely substitute his judgment for that of the jury." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001). "If the jury

verdict is supported by the evidence, then it is immaterial that we or the district judge would have arrived at the same verdict because it is not our place to substitute our judgment for that of the jury." *Auto-Owners Ins. Co. v. Southeast Floating Docks, Inc.*, 571 F.3d 1143, 1145 (11th Cir. 2009). A district court may reexamine the evidence in ruling on a motion for new trial. *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 310 (11th Cir. 1988). Even so, a court "should not substitute [its] own credibility choices and inferences for the reasonable credibility choices and inferences made by the jury." *Walls v. Button Gwinnett Bancorp., Inc.*, 1 F.3d 1198, 1200 (11th Cir. 1993) (citation omitted).

As discussed *supra*, Defendants are in error contending Galbreath had any duty to provide testimony or evidence establishing she made reasonable efforts to obtain comparable work. Defendants alone bore the burden associated with this affirmative defense. *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1348 (11th Cir. 2000).

Additionally, the Court cannot conclude that the jury's verdict is against the great weight of the evidence simply because Galbreath did not "apply for any work" since her termination. Galbreath did not have a duty to "apply for any work." She had a duty to make reasonable efforts to obtain "substantially comparable" employment. *Weaver*, 922 F.2d at 1527. As discussed *supra*, the line of questioning on cross-examination did not establish that Galbreath made no reasonable efforts to obtain substantially comparable employment. The specific question was whether she applied. This excludes any of the other legitimate, reasonable efforts that she

might have made that led to her answer that "there was no use in [her]" applying. (Doc. 79, p. 217). But Defendants did not flesh out what Galbreath meant by her response. Therefore, the Court cannot say that the jury's verdict is against the great weight of the evidence on this point; a new trial is unwarranted.

## C. Whether a New Trial is Necessary on Galbreath's Breach of Contract Claim

Defendants also contend the jury's verdict regarding Galbreath's breach of contract claim is against the great weight of the evidence. Defendants argue, "[T]here is no dispute that plaintiff failed to keep and record the minutes of the County Commission, which was a statutorily-required part of her job duties." (Doc. 80, p. 45). Galbreath responds that a new trial is improper for the same reasons judgment as a matter of law is improper on this point. (Doc. 96, p. 56).

The Court finds Defendants' position unavailing. As discussed more thoroughly above, Galbreath testified that she recorded the minutes from every commission meeting. (Doc. 79, p. 138). These minutes were later keyed into her work computer and kept as a "record in the county commission office." (Doc. 79, pp. 138, 220). Galbreath presented such minutes from one of the meetings. (Doc. 72-1, p. 54; Doc. 79, p. 133). Therefore, it is not, as Defendants contend, undisputed that Galbreath failed to keep the meeting minutes.

As to recording the minutes kept, testimony differed between Galbreath and one of her clerks as to the difficulties surrounding printing the meeting minutes onto the oversized minute book pages and having commissioners available to sign these printed pages. The Court will not determine which account is more credible

in deciding the present motion.  *Watts*, 842 F.2d at 1145.  Nonetheless, it is not as if Galbreath never permanently recorded meeting minutes.  Instead, meeting minutes were missing for only the year preceding her termination.  (Doc. 72-2, p. 24).  This corroborates her testimony that she would periodically print out the meeting minutes due to the proclaimed difficulties in the printing process.

Moreover, Alabama's Open Meeting Law does not articulate a specific deadline for permanently recording meeting minutes.  Instead, they are to "be made available to the public as soon as practicable after approval."  Ala. Code § 36-25A-4 (1975).  And the Alabama statute addressing county administrator duties does not articulate a deadline for permanently recording minutes.  Ala. Code § 11-3-18 (1975).  The fact that no deadline is named does not excuse being completely derelict in this duty.  But complete dereliction of this duty is not the case.  Instead, the question is whether the one years' missing minutes based on Galbreath's periodic printing because of purported issues is nonperformance of her duties under the 2012 Contract.  Neither statute prohibits Galbreath's periodic permanent recordation.  Thus, the Court cannot say that the jury's verdict on Galbreath's breach of contract claim is contrary to the great weight of the evidence or contrary to law.

### D. Whether a New Trial is Necessary Based on Jury Instructions

Defendants contend a new trial is due because the jury was charged that "pre-termination due process required Defendants to provide [Galbreath] notice and an opportunity to 'defend herself' (as opposed to an opportunity to 'respond') prior to

her termination." (Doc. 80, p. 46). Defendants maintain that the "defend herself"

language does not square with the law and "imposed a more rigorous procedure

than is actually required." *Id.* Defendants cite *Harrison v. Willie*, 132 F.3d 679

(11th Cir. 1998) and *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) in support of

this proposition. Galbreath responds that the Court's instruction "comports with

Eleventh Circuit precedent," citing *Harris v. Birmingham Board of Education*, 817

F.2d 1525 (11th Cir. 1987). (Doc. 96, p. 56).

"A district court has broad discretion in formulating jury instructions." *Toole*

*v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1313 (11th Cir. 2000) (citing *Christopher*

*v. Cutter Laboratories*, 53 F.3d 1184, 1190 (11th Cir. 1995)). Indeed, a trial judge "is

not bound to parrot either counsel or appellate courts" in charging a jury. *Bass v.*

*Int'l Bhd. of Boilermakers*, 630 F.2d 1058, 1061 (5th Cir. 1980). A trial judge's "wide

discretion permits him to select his own words and to charge in his own style" as

long as the substance of the law is correctly communicated. *Id.* Unsurprisingly so,

"[m]otions for new trial on the basis of erroneous and prejudicial jury instructions

are committed to the discretion of the trial court and reviewed to ascertain whether

there has been a clear abuse of that discretion." *Toole*, 235 F.3d at 1313. Thus, a

new trial motion should be granted when jury instructions do "not accurately reflect

the law in such a way that we are left with a substantial and ineradicable doubt as

to whether the jury was properly guided in its deliberations." *Cleveland v. Home*

*Shopping Network, Inc.*, 369 F.3d 1189, 1196 (11th Cir. 2004).

An alleged error in wording of a jury charge is not read in a vacuum. Instead,

the contested charge must be considered in the context of the entire jury charge. "Only if the trial judge's instructions to the jury, taken as a whole, give a misleading impression or inadequate understanding of the law and the issues to be resolved, is a new trial required." *Bass*, 630 F.2d at 1062; *see also Merchants Nat. Bank of Mobile v. United States*, 878 F.2d 1382, 1388 (11th Cir. 1989) ("[T]he trial court's refusal to give a requested instruction is not error where the substance of that proposed instruction was covered by another instruction which was given.") An error in a jury instruction that does not influence a verdict is harmless and an improper ground for new trial. *See Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 758 (2d Cir. 2004).

As it relates to notice and an opportunity to respond under Galbreath's due process claim, the Court instructed the jury as follows:

> For the third element, you must determine whether the Hale County Commission and Hale County provided Plaintiff with both notice of the reasons for her termination and an opportunity to respond and defend herself before discharging her from her job as county administrator. Notice and an opportunity to respond is not a mini-trial and need not definitively resolve the propriety of the proposed termination. Instead, notice and an opportunity to respond serve as an initial check against mistaken termination decisions. But notice, either oral or written, must inform an employee of the charges against her and an explanation of the employer's evidence against her.

> Additionally, the opportunity to respond must afford the employee an opportunity to defend herself against the charges brought against her after receiving notice.

(Doc. 79-1, pp. 110–11).

To defend is nothing more than to "attempt to disprove or invalidate" a claim with one's side of the story. *See* THE AMERICAN HERITAGE DICTIONARY 475 (5th ed.

2011).  To instruct a jury of this does not conflict with the law of this circuit.

Instead, it squares with what the Eleventh Circuit evaluated a pre-termination

hearing provided in one of the cases Defendants cite.  *See Harrison*, 132 F.3d at 684

("Plaintiff had several opportunities to be heard.  All three of his initial statements

and the two separate predisciplinary conferences provided Plaintiff the opportunity

to present evidence in his *defense*—to tell his side of the story.") (emphasis

supplied).  *See also Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13 (1950)

("An elementary and fundamental requirement of due process … is notice

reasonably calculated, under all circumstances, to apprise interested parties of the

pendency of the action and afford them *an opportunity to present their objections*.")

(emphasis supplied); *Allred v. City of Carbon Hill*, No. 6:13-cv-00930-LSC, 2013

U.S. Dist. LEXIS 144570, 2013 WL 5532719, at *26 (N.D. Ala. Oct. 7, 2013)

(evaluating whether an employee was afforded a pre-termination "opportunity to

defend himself" in deciding a motion to dismiss).  Further, in the other case

Defendants cite, the Eleventh Circuit concluded the employee in question received

all the process due under *Loudermill*.  *McKinney*, 20 F.3d at 1561.  "[H]e received

written notice of the charges against him; at the Board hearing, he also heard an

explanation of the Board's evidence; finally, with the assistance of counsel, *he had

the opportunity to present his side of the story through witnesses, evidence, and

argument*."  *Id.* (emphasis supplied).  This language illustrates that due process

envisions an opportunity to do more than simply answer "yes" or "no" to the veracity

of a charge.  It is an opportunity to defend against a mistaken decision with one's

side of the story.  In this case, the Court instructed the jury in accordance with this.

Further, it appears that Defendants identify the Court's use of the word "defend" with something more than a mini-trial but apparently less than a full evidentiary hearing.  This is in error.  The Court explicitly instructed the jury that a mini-trial was not required to satisfy due process and the truth of the charges need not be definitively determined, although Galbreath could respond and defend herself.  Thus, when the term "defend" is read in context of the entire instruction, it meant nothing more than Galbreath was allowed to provide her side of the story, which was not misleading.  *Bass*, 630 F.2d at 1062.  Because the term "defend" put no greater responsibility on Defendants regarding the pre-termination hearing than the law required, it was not prejudicial and is no basis for a new trial.[8]

## IV. CONCLUSION

For the reasons explained above, the Court **DENIES** Defendants' Renewed Motion for Judgment as a Matter of Law and, Alternatively, Motion for New Trial (Doc. 80).

**DONE** and **ORDERED** this 8th day of August, 2017.

/s/  Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE

---

[8] Since Defendants' case law shows that they are not due a new trial, the Court does not draw support from or address Galbreath's citation to *Harris v. Birmingham Board of Education*, 817 F.2d 1525 (11th Cir. 1987).  Even so, the Court finds it questionable that *Harris* applies since that case evaluated a post-termination hearing.